UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                                        :
GEORGE T. HAYES, JR,                                    :
                                                        :
                              Plaintiff,                :     06-CV-4415 (AKH)
                                                        :
           - against -                                  :
                                                        :
THE INTERPUBLIC GROUP OF COMPANIES,                     :
INC., MCCANN-ERICKSON USA, INC. and                     :
DOE CORPORATIONS 1-5,                                   :
                                                        :
                              Defendant(s).             :
                                                        :
----------------------------------------------------------------x

## DEFENDANTS THE INTERPUBLIC GROUP OF COMPANIES, INC., MCCANN-ERICKSON USA, INC.'S STATEMENT OF UNDISPUTED FACTS PURSUANT TO RULE 56.1 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, defendants The Interpublic Group of Companies, Inc., and McCann-Erickson USA, Inc. submit that the following material facts are not in dispute:[1]

**Universal McCann – Overview**

1.      Universal McCann ("UM"), a subsidiary of The Interpublic Group of Companies ("IPG"), is a global media specialist division of McCann-Erickson Worldwide.  (Pl. Dep. 15:7-11; Brien Dep. 173:19-174:6.)

---

[1]      The undisputed facts set forth herein are followed by citations to their support in the record.  Copies of all pleadings, deposition testimony and exhibits cited herein are annexed to the accompanying Declaration of Dov Kesselman, dated November 8, 2007 ("Kesselman Decl."), the Declaration of Karina Costantino, dated November 8, 2007 ("Costantino Decl."), and the Declaration of Nick Brien, dated November 6, 2007 ("Brien Decl.").  Citations to deposition transcripts are shown as "[Witness Name] Dep. Page:Line".  Selected pages from the following deposition transcripts are annexed to the Kesselman Decl.: Plaintiff George Hayes, Ex. A; Nick Brien, Ex. B; and Mary Gerzema, Ex. C.

2.     UM provides strategic services and consultancies in the areas of traditional and non-traditional advertising and media planning and buying, communications architecture, digital technologies, and research/modeling. (Brien Decl. ¶ 2.)

**UM's Well Established Policies To Prevent Discrimination**

3.     At all relevant times, UM maintained an equal employment opportunity policy which included a policy against discrimination and harassment on the basis of age and any other protected classification, as well as a non-discrimination/non-harassment complaint procedure. (Pl. Dep. at 19:15-20:3; Kesselman Decl. Ex. D at 25-26.)

4.     UM's equal employment opportunity policy was contained in, among other places, its Employee Handbook, a copy of which was available to every UM employee.  This policy mandates that UM's employment decisions be made "without regard to race, religion, color, national origin, sex, sexual orientation, age, veteran status, disability or any other basis prohibited by applicable federal, state or local laws."  (Pl. Dep. at 20:4-6, 20:24-21:7; Kesselman Decl. Ex. D at 24.)

5.     UM also had trainings concerning non-retaliation with respect to these employment policies, and Plaintiff understood UM's policy with respect to non-discrimination. (Pl. Dep. 19:15-20:2.)

6.     Plaintiff was employed at UM in various positions from September 1, 1975 through the termination of his employment on December 13, 2005.  Plaintiff continued to work at UM after the notice of his termination until February 9, 2006.    (Pl. Dep. 24:21-25:9; Kesselman Decl. Ex. E (Complaint), ¶¶ 9, 41.)

7.     Plaintiff's date of birth is January 28, 1952.  (Pl. Dep. 7:21-22.)

8.     Plaintiff admits that he was not subjected to age discrimination at UM prior to Nick Brien's arrival on October 1, 2005.  (Pl. Dep. 12:5-17.)

**UM Suffered Extraordinary Client and Financial Losses in the Years Leading Up to The Restructuring That Resulted In the Termination of Plaintiff's Employment**

9.      Between 2003-2005, UM suffered the loss of many of its significant clients and business, and was experiencing severe operational problems.  (Pl. Dep. 39:13-41:23, 60:22-62:20; Brien Dep. 157:14-160:16, 197:19-198:23, 294:5-8, 294:24-296:6; Gerzema Dep. 38:5-13, 43:8-45:4. See also Pl. Dep. 27:17-28:10, 54:9-12, 105:11-14, 140:13-143:6, 155:5-11; Brien Dep. 86:8-24.)

10.      Indeed, by the end of 2005, UM's clients were extremely frustrated with UM's leadership and competence, and as a result, UM had lost numerous of its significant accounts, including: Nestle, General Motors, MasterCard, Garnier, Unilever, Colgate-Palmolive, Kimberly-Clark, Coca-Cola, Motorola, Richemont, Lowe's and others.  (Pl. Dep. 39:13-41:23, 60:22-62:20; Brien Dep. 157:14-160:16, 197:19-198:23, 294:5-8, 294:24-296:6; Gerzema Dep. 38:5-13, 43:8-45:4; Kesselman Decl., Exs. F, G, H, I, J.  See also Pl. Dep. 27:17-28:10, 54:9-12, 105:11-14, 140:13-143:6, 155:5-11; Brien Dep. 86:8-24.)

11.      Furthermore, by 2005, UM was at risk of losing still other critical accounts, including L'Oreal, Microsoft, Intel, and Sony.  (Brien Dep. 138:2-13, 158:20-159:7, 194:5-20; Pl. Dep. 114:14-116:2, 266:5-267:5; Kesselman Decl., Ex. K.)

12.      A number of these accounts that left UM, including Nestle, Richemont and Lowe's, were handled by Plaintiff at the time of their departure.  (Pl. Dep. 40:2-24, 287:8-19**;** Brien Dep. 186:20-187:9; Gerzema Dep. 112:20-113:12.  See also Pl. Dep. 27:17-28:10, 54:9-12, 105:11-14, 140:13-143:6, 155:5-11; Kesselman Decl. Exs. G, I, J, L, M.)

13.      In addition to the loss of clients across the world, many of UM's executives were leaving the company in 2005, causing further disruption to the company.  (Pl. Dep. 65:12-20, 69:22-71:6, 72:9-73:14; Brien Dep. 152:5-155:18; Gerzema Dep. 52:16-23.)

14.     As a result, by September/October 2005, morale at UM had reached a low, and even senior managers, including Plaintiff, had discussions concerning the morale problems at UM.  (Costantino Decl., Ex. BB ("Morale low, very difficult to recruit (staff turnover approx 50%)"); Pl. Dep. 78:9-79:22, 80:23-82:6; 86:25-87:9.)

15.     Indeed, as far back as December 2003, then-Chairman and CEO Robin Kent noted the concerns about UM's performance, and wrote to numerous senior staff with the message: "This has been a disappointing year . . We have simply failed to deliver . . . we became complacent, lazy and sloppy in our approach and have the highest price.  This cannot happen again, we will not get a second chance . . . Going forward, we need to fundamentally change how we go to market, how we work as an organization . . ."  (Kesselman Decl., Ex. N; Pl. Dep. 56:18-57:14.)

**UM Works to Change Leadership, and To Change the Way UM Operates**

16.     In or around the Spring of 2005, UM terminated the employment of Robin Kent, the former Chief Executive Officer of UM.   (Pl. Dep. 44:2-24; Brien Dep. 295:12-296:2; Gerzema Dep. 23:13-15.)

17.     While UM was searching for a new CEO, from March 2005 until October 1, 2005, Murray Dudgeon, the Global Chief Operating Officer at UM, effectively served as an interim or acting CEO.  Mr. Dudgeon had at that point been with UM for more than twenty years.  (Pl. Dep. 89:23-90:6; Brien Dep. 30:5-14, 33:13-34:7, 91:5-8, 200:18-201:5.)

18.     On October 1, 2005, Mr. Nick Brien was hired as Chief Executive Officer of UM. At the time of his hire, Mr. Brien was 43 years old.  (Brien Dep. 6:21-7:4, 17:8-9, 171:16-22, 390:2-6.)

19.     Mr. Brien's mandate, and the reason that he was hired, as he understood it, was to stabilize a business that was "broken" and underperforming in the view of both IPG and UM's

4

clients, while at the same time solving a compensation revenue ratio that was nearly double the industry average.  (Brien Dep. 9:11-18, 11:2-10, 199:14-24, 377:21-378:8.)

20.     Indeed, by the time Mr. Brien received UM's final profit and loss statement for 2005, UM's New York office had lost $8 million from January through October 2005, and globally, UM was projected to lose between $30 and $35 million.  (Brien Dep. 198:15-199:13.)

21.     Furthermore, projections for 2006 – including those made by Plaintiff – were not expected to be any better.  Indeed, Plaintiff himself believed that "best case" scenario for 2006 would be keeping revenues "flat," and even that was viewed as "too optimistic."  (Kesselman Decl. Ex. H; Pl. Dep. 148:15-150:6.  See also Brien Dep. 198:15-201:2.)

22.     As a result of these significant business and client losses, UM was significantly overstaffed in certain markets around the world as compared to the existing clients that it was servicing.  (Brien Dep. 22:4-17, 27:25-28:12, 84:15-86:14; 283:13-284:3, 290:17-291:4.)

**Nick Brien Confers with Murray Dudgeon and Develops His Plan – Avoid Further Client Losses and Restructure UM**

23.     Even before officially becoming CEO and starting at UM, Mr. Brien met with Murray Dudgeon in September 2005 to question Mr. Dudgeon about UM based on Mr. Dudgeon's lengthy period of experience, knowledge, and insight into UM.  (Brien Dep. 28:23-29:19.)

24.     Mr. Dudgeon confirmed what Mr. Brien had already heard — that UM had dissatisfied clients, that clients were not being proactively led and managed, and global clients were frustrated with UM's global inconsistency of its network — and Mr. Brien concluded that the significant client losses over the last 24 months at UM had to stop.  (Brien Dep. 29:20-33:12.)

25.     Upon his arrival at UM, Mr. Brien feared that UM's business could get even worse because two additional significant accounts (Intel and L'Oreal) were in review, the Microsoft account was in danger of going into review, and Sony had expressed to UM that they were going to review their agency of record, such that all of this business was at risk of being lost.  (Brien Dep. 194:5-17.)

26.     As such, upon his arrival at UM as CEO, Mr. Brien focused his attention on preventing further client losses and to secure the business from UM's existing clients on a going-forward basis.  (Brien Dep. 158:18-159:19, 160:6-16, 192:8-11, 194:21-195:12.)

27.     To accomplish this, and in an effort to improve UM's relationships with and to better serve its existing accounts, Mr. Brien decided that UM would not make any new business pitches in 2006, and instead would focus on its existing clients.  (Brien Dep. 136:17-138:13; 194:5-195:12; 204:11-205:2, 282:7-22; Gerzema Dep. 81:10-84:10, 87:6-8.)

28.     In addition, because of his expectation that things would get worse before they got better, Mr. Brien concluded that it did not make business sense to continue to employ senior client-facing executives with no significant existing client relationships.  (Brien Dep. 193:9-194:20.)

29.     Thus, Mr. Brien requested Mr. Dudgeon to create a restructuring plan for New York in an effort to address the significant business losses, and that his recommendations focus on who had active books of business and who did not.  (Brien Dep. 96:3-9; 122:5-123:16, 193:9-194:4.)

30.     Mr. Dudgeon had the responsibility for the restructuring of the New York office. (Brien Dep. 211:13-16, 259:25-260:13; See also Brien Dep. 209:9-17.)

**Mr. Dudgeon's Recommendation that Plaintiff's Employment Be Terminated Because By October 2005, Plaintiff Was No Longer Responsible for Any Accounts.**

31.     When Mr. Dudgeon eventually presented his restructuring plan to Mr. Brien in October 2005, Mr. Dudgeon raised, for the first time, the subject of terminating Plaintiff's employment.  (Brien Dep. 193:6-194:4.  See also Brien Dep. 96:3-9, 106:8-17.)

32.     Mr. Dudgeon's date of birth is December 1, 1955.  (Costantino Decl. ¶ 2.)

33.     Mr. Dudgeon told Mr. Brien that given the need to adjust UM's cost base to a realistic level, in particular given the significant loss of business in New York, he concluded that certain individuals did not have business to sustain their continued employment with the company.  (Brien Dep. 193:20-194:4.)

34.     Mr. Dudgeon informed Mr. Brien that the restructuring would include approximately 30 people, and he informed Mr. Brien only about his recommendations with respect to senior leaders who had been with the company for a long time.  (Brien Dep. 207:16-208:24.)

35.     Mr. Brien was advised by Mr. Dudgeon that, by this time, Plaintiff did not have any significant existing client relationships and, because he did not have direct client relationships, was not fully employed.  (Brien Dep. 96:3-9, 106:8-23, 111:11-15, 122:5-24.)

36.     Indeed, by the time Mr. Brien arrived in October 2005, Plaintiff did not hold a management role with any of UM's key accounts and did not directly have any business.  (Pl. Dep. 199:11-20; Brien Dep. 174:24-175:10; Costantino Decl. Ex. CC ("This has been his only focus (he has no other accounts) for about a month and it is still [not] cracked"); See also 56.1 Stmt. ¶ 12 (citing record).)

37.     For example, Plaintiff had been responsible for the Nestle account in 2004.  (Pl. Dep. 146:23-147:22.)

38.     In October 2004, UM lost the business from Nestle, resulting in a significant loss of revenue.   (Pl. Dep. 40:15-18, 54:9-12, 60:22-62:3, 103:3-104:18, 105:3-14, 107:3-15; Gerzema Dep. 45:3-4; Kesselman Decl. Exs. L, M.)

39.     Lowe's was another account with which Plaintiff had the client relationship, and in 2005, Plaintiff spent approximately 438.25 hours on that client.   (Pl. Dep. 36:3-7, 140:13-143:6; Costantino Decl. Ex. AA.)

40.     In or around September 2005, UM lost Lowe's as a client after losing a pitch to keep the Lowe's account.   (Pl. Dep. 40:21-22; 62:13-16; 141:24-143:6; Gerzema Dep. 43:8-19, 44:18-45:2; Kesselman Decl. Ex. G.)

41.     Plaintiff was also the senior client executive responsible for the Richemont account.   (Pl. Dep. 26:6-27:16, 153:18-155:11.)

42.     As of June 30, 2005, Richemont decided to terminate its relationship with UM and put its business up for bid to other agencies.   (Pl. Dep. 155:5-11, 161:6-15; Kesselman Decl. Ex. J.)

43.     In September 2005, UM lost its pitch to keep the Richemont account, and this account was thus lost as well.   (Pl. Dep. 27:17-20; 40:23-24; 62:4-5; 155:5-11; Brien Dep. 349:17-350:3; Gerzema Dep. 44:20-23.)

44.     In the year before, on July 1, 2004, Sony, UM's largest U.S. client and another client of UM for which Plaintiff was responsible at that time, e-mailed Plaintiff to complain that they were "disappointed with the way we at SCA have been serviced and it feels to us that Sony is not a priority account" and raised several issues.   (Kesselman Decl. Ex. O.; Pl. Dep. 123:3, 121:17-123:3, 111:6-112:22; Gerzema Dep. 173:20-23.)

45.     Sony brought to Plaintiff's attention, both in writing and orally, its concerns over what it believed was UM's declining service and the way in which UM handled the Sony account.  (Pl. Dep. 122:22-125:10; Kesselman Decl Ex. O; see also Kesselman Ex. P at 1 ("Sony companies participating in AOR Agreement universally felt a decline in service during the first six months of this fiscal year, mostly related to inefficient staffing and lack of senior management involvement" (emphasis added).)

46.     Sony was not satisfied with Plaintiff's response to the issues it had raised, ultimately necessitating then-CEO Robin Kent to become involved in the account by, among other things, scheduling a meeting with Sony to assuage their concerns.  (Kesselman Decl. Ex. K; Pl. Dep. 114:14-115:4; Gerzema Dep. 160:4-20.)

47.     On August 18, 2004, then-UM CEO Robin Kent and Lynn Pinkus met with representatives of Sony clients, and Mr. Kent conveyed the message to Plaintiff and other UM employees that "to be absolutely clear, if it were [Sony] corporate's decision we would be fired." (Kesselman Decl. Ex. K; Pl. Dep. 114:14-115:4.)

48.     By May 2005, Ms. Lynn Pinkus had replaced Plaintiff as the lead person responsible for the day-to-day contacts with Sony.  (Pl. Dep. 91:11-24; 117:4-118:13; Brien Dep. 94:8-95:6; 348:22-349:6; Kesselman Decl. Ex. F.)

49.     Indeed, between 2004 and 2005, Plaintiff's time records show that his time spent on the Sony clients dropped from 893 hours in 2004 to just 146 hours in 2005.  (Costantino Decl., Ex. AA.)

50.     By September 2005 – and before Nick Brien's arrival - Plaintiff was no longer responsible for the Verizon Wireless account and the primary responsibility for this account was

transferred from Plaintiff to Mary Gerzema.   (Pl. Dep. 74:6-76:23, 77:2-6; Gerzema Dep. 113:19-120:16, 144:2-4, 142:4-144:4.)

51.     Mr. Brien, who joined UM as of October 1, 2005, had no part in Plaintiff's removal from any of the above-listed accounts.   (Brien Dep. 158:18-159:11; Gerzema Dep. 144:2-4; 56.1 Stmt. ¶¶ 9-10, 12 (citing record).)

52.     Plaintiff recorded the time that he spent on the various clients that he worked on, which time was maintained by UM.   (Pl. Dep. 75:25-76:8.)   For 2005, the records show that every client that Plaintiff had spent any significant time on during 2005 had either left UM, announced that they were leaving, or had been reassigned to another executive:   (a) Lowe's (438.25 hours) had left, (b) Nestle (203 hours) had left, (c) Richemont (386 hours) had announced they were leaving, (d) Sony (136 hours – down from 893 hours from the year before) had been already been reassigned by former UM CEO Robin Kent to Lynn Pincus, and (e) Verizon Wireless (258 hours) had been reassigned.   (Costantino Decl., Ex. AA; 56.1 Stmt. ¶¶ 12, 37-50 (citing record).)

53.     Indeed, on April 20, 2005, Plaintiff stated that prior to his having been assigned to act as "acting" regional director for Latin America, he had had "nothing to do" and was "worrying that pretty soon someone would catch on."   (Kesselman Decl. Ex. Q at UM 02708; Pl. Dep. 43:9-21.)

**Mr. Brien Adopts Mr. Dudgeon's Recommendation**

54.     At the time that Mr. Dudgeon made his recommendation to terminate Plaintiff's employment in October 2005, Mr. Dudgeon was roughly the same age as Plaintiff, at approximately 50 years old.   (Costantino Decl. ¶ 2; Pl. Dep. 35:21-24.)

55.     Plaintiff and Mr. Dudgeon "had a good relationship," that Mr. Dudgeon respected him, and he respected Mr. Dudgeon and that Mr. Dudgeon was a "very good guy."  (Pl. Dep. 32:16-23, 35:14-16, 282:9-10.)

56.     Plaintiff did not know that Mr. Dudgeon and Mr. Brien met to discuss him or his continued employment.  (Pl. Dep. 235:17-19.)

57.     Plaintiff admits that he does not know who made the decision to terminate his employment.  (Pl. Dep. 34:8-11.)

58.     Upon receiving Mr. Dudgeon's recommendation, Mr. Brien asked Mr. Dudgeon why Plaintiff did not have any direct client business, and he was informed that Plaintiff's "business had left and that [Plaintiff] had also suffered from some negative perceptions from clients."  (Brien Dep. 333:4-333:10; See also Brien Dep. 96:3-9, 106:8-23.)

59.     Mr. Brien did not know Plaintiff's age at the time, although he guessed him to possibly be in his late 40s.  (Brien Dep. 207:16-208:14, 269:19.)

60.     Notwithstanding Plaintiff's lack of client relationships, in an effort to avoid terminating Plaintiff's employment, Mr. Brien sought to ascertain if there were any existing clients for which Plaintiff take the lead responsibility or if there were any leadership roles for him.  (Brien Dep. 269:13-21; 380:18-381:9.)

61.     Mr. Brien spoke to Microsoft and Sony to determine if there was a role Plaintiff could play on either of those accounts.  (Brien Dep. 270:7-271:13; 380:24-381:9.)

62.     Mr. Brien was told that Microsoft wanted someone with significant global technology experience and for that person to be based in San Francisco – either of which disqualified Plaintiff.  (Brien Dep. 290:11-16; Brien Decl. ¶ 14.)

63.     Mr. Brien also spoke to Sony to determine what their strategic leadership needs were, but concluded that given Plaintiff's past performance on the Sony account and the client's needs and demands, Plaintiff could not play a leadership role on that account.  (Brien Dep. 381:4-9; Brien Decl. ¶ 14.)

64.     Mr. Dudgeon told Mr. Brien that he had exhausted any opportunities to find employment within UM for Plaintiff.  (Brien Dep. 273:22-25.)

65.     Plaintiff was not the lead person on the Microsoft account, and while he spent some time addressing a problem with the Microsoft account at the request of Murray Dudgeon, Plaintiff's time entries show that he spent only a total of 49 hours on Microsoft in 2005.  (Pl. Dep. 81:6-86:15, 83:25-84:4; (Costantino Decl. Ex. AA.)

66.     Mr. Brien ended up taking personal responsibility for dealing with the problems with Microsoft.  (Pl. Dep. 84:22-86:16; Brien Dep. 115:14-15; Brien Decl. ¶ 13.)

67.     Plaintiff also spent some time around the time of his termination working on a new business pitch for a small part of Exxon Mobil's Corporate business.  This pitch was not linked to the ExxonMobil Oil and Lube account, which was a significant existing UM global client relationship led by Mike Neiss out of the Houston office.  (Pl. Dep. 36:16-19, 38:7-39:12, 196:15-197:6, 199:3-10; Brien Dep. 113:23-25; Gerzema Dep. 187:22-188:19.)

68.     Hayes had no responsibility for the ExxonMobil Oil and Lube account.  (Pl. Dep. 196:15-197:16, 199:3-10; Gerzema Dep. 187:22-188:19.)

69.     Plaintiff spent only about 2-3 hours per day on the Exxon Mobil corporate pitch while the pitch was active.  (Pl. Dep. 197:20-198:18.)

70.     After receiving Mr. Dudgeon's recommendation, Mr. Brien concluded that Plaintiff was being carried by the business, and that UM could not afford to carry a senior

manager with no clients, business, or revenue to support his role.  (Brien Dep. 266:23-267:8, 328:3-14, 357:10-15.  See also Brien Dep. 123:11-16, 264:16-23.)

71.    Mr. Brien adopted Mr. Dudgeon's recommendation to terminate Plaintiff's employment because of the restructuring and because there was no client responsibility for his level; simply put, he was a senior manager that was not associated directly with any clients or business.  (Brien Dep. 264:16-23, 123:11-16, 193:9-194:20, 96:3-9, 106:8-17; Pl. Dep. 199:11-16 ("That I had no other accounts that I was assigned to, that's correct".))

72.    Further, there was no open operational or client responsibility available at Plaintiff's level, and UM in the United States had been overstaffed at the senior level because of all the business that had been lost.  (Brien Dep. 266:5-11, 283:11-284:3, 290:7-291:16.  See also Brien Dep. 123:11-16.)

73.    Nor did Mr. Brien believe that he had the "luxury" of creating a new position for Plaintiff.  (Brien Dep. 123:14-16.)

**Plaintiff is Advised of the Termination of His Employment By Mr. Dudgeon**

74.    Plaintiff was informed of his termination on December 13, 2005 by Murray Dudgeon and Dana Mansfield.  (Pl. Dep. 24:21-25:3.)

75.    At the time that Mr. Dudgeon informed Plaintiff of the termination, Plaintiff was fifty-three years old.  (Pl. Dep. 7:21-22.)

76.    Mr. Dudgeon was himself fifty (50) years old at that time.   (Constantinto Decl. ¶ 2; Pl. Dep. 35:21-24.)

77.    Plaintiff alleges he was told by Mr. Dudgeon that the reason his employment was being terminated was that "big changes [were] taking place" at UM and he "didn't have the skill set that was needed."  (Pl. Dep. 175:10-11, 281:11-282:10; Kesselman Decl. Ex. R.)

78.     During this meeting, Mr. Dudgeon told him that his termination was effective immediately, but that UM wished him to remain working for UM until February 9, 2006, during which time he was to focus on collecting a substantial amount of money that was owed to UM by Richemont, a client which was leaving UM and with which no one at UM had the relationship that Plaintiff did.  (Pl. Dep. 24:21-26:22, 281:11-282:10.)

79.     In December 2005, UM terminated the employment of twenty-five other employees under the age of 40 in job eliminations related to Mr. Dudgeon's restructuring effort. (Costantino Decl. ¶ 5.)

**The Evidence Makes Clear that Age Played No Part in Any Decisions Relating to Plaintiff**

**Mr. Brien Met with Senior Employees – Irrespective of Age — In His Early Days at UM, Including Plaintiff**

80.     On October 5, 2005, shortly after Mr. Brien joined UM, Plaintiff was invited with others to a cocktail reception and dinner so that UM senior managers could meet Mr. Brien. Approximately 50-60 people were invited to the cocktail reception, and a smaller group of 15 people were invited to the dinner.  (Pl. Dep. 211:17-212:18, 231:9-12; Brien Dep. 59:23-61:16; Gerzema Dep. 96:11-21; Kesselman Decl. Ex. S.)

81.     In fact, Mr. Brien sat and spoke with Plaintiff at the dinner, and Plaintiff was pleased to find that Mr. Brien agreed with some of the ideas that Plaintiff raised during their conversation, such that Plaintiff felt "Wow, this is great, we are on the same page."  (Pl. Dep. 211:17-213:5.)

82.     Plaintiff admits that Mr. Brien did not make any comments at this dinner that suggested he had a problem or issue with Plaintiff's age.  (Pl. Dep. 212:22-213:5.)

83.     Other UM employees over the age of 50 were also invited to this dinner, including Peggy Kelly (56), Jean Pool (60), Donna Wolfe (54), and Murray Dudgeon (50), as well as other employees.   (Kesselman Decl. Ex. S; Costantino Decl. ¶ 2.)

84.     In addition, on September 28, 2005, Plaintiff was invited to schedule time to meet with Mr. Brien once he began working with UM, as were other employees.   The ages of these individuals varied, with numerous over the age of 50, and others over the age of 40.  (Kesselman Decl. Ex. I; Pl. Dep. 224:12-229:9.)

85.     For example, included among Mr. Brien's invitees were:  Jean Pool (60 years old), Peggy Kelly (56 years old), Donna Wolfe (54 years old), Joseph Studley (53 years old), Murray Dudgeon (50 years old), Susan Nathan (49 years old), Barbara Jewell (46 years old), Mary Gerzema (42 years old), and others.   (Kesselman Decl. Ex. I; Pl. Dep. 224:12-229:9; Costantino Decl. ¶ 2.)

86.     Although Plaintiff's scheduled meeting with Mr. Brien was cancelled, and Plaintiff "wonder[ed]" why he had cancelled the meeting, he admitted that at the time he "did not think that much about it," and figured that "maybe something came up."  His meeting was rescheduled the next week, but was cancelled again.  (Pl. Dep. 214:5-24, 263:12-264:6.)

87.     Plaintiff was not alone in his inability to schedule meetings with Mr. Brien, and in fact, most leaders at UM were frustrated with their inability to meet Mr. Brien one-on-one during the first months of his employment.  (Brien Dep. 66:13-67:2.)

88.     Mr. Brien was not aware that Plaintiff had attempted to reschedule his meetings with his secretary.   He was not aware of the rescheduling efforts of Plaintiff's meetings, like others' meetings, because his travel schedule was "extremely choppy" for his first several months at UM. (Brien Dep. 66:7-67:17.)

89.     Indeed, in October 2005, Mr. Brien traveled for three out of four weeks to Asia, Europe and Latin America, and spent one week in the New York office and in San Francisco and Los Angeles.  (Brien Dep. 57:9-25.)

**Plaintiff's Allegation that He Was "Excluded" By Mr. Brien From A Meeting Because of His Age is Without Basis.**

90.     Plaintiff alleges as part of his claim of age discrimination that he was not invited to a meeting on November 18, 2005, which he asserts was because of his age.  (Kesselman Decl., Ex. E  (Complaint) at ¶ 30; Pl. Dep. 215:19-21, 259:22-260:4.)

91.     In fact, there was a strategic meeting held on November 18, 2005. (Kesselman Decl. Exs. U, V; Pl. Dep. 232:21-233:9; Brien Dep. 54:22-25; Gerzema Dep. 312:20-320:3.)

92.     Plaintiff does not know the basis by which people were invited to this meeting, nor did he know who determined the list of people that would be invited.  (Pl. Dep. 232:21-233:9, 262:23-263:11.)

93.     The list of people that would be invited was developed by Mr. Dudgeon without any input from Mr. Brien other than Mr. Brien's direction that Mr. Dudgeon consider inviting a selection of regional and global individuals that had significant client relationships and business. (Brien Dep. 54:22-55:22, 56:3-20.  See also Kesselman Decl. Exs. U, V.)

94.     Mr. Brien also asked Mr. Dudgeon to work with an outside strategic consultant who was managing this strategic meeting project to ensure the necessary individuals were being invited.  (Brien Dep. 56:3-20.)

95.     Plaintiff was not selected by Mr. Dudgeon to attend this meeting.  (Brien Dep. 55:17-19; Pl. Dep. 215:19-21.)

96.     In fact, there were several people invited to this November 18, 2005 meeting who were over the age of 50, including Peggy Kelly (56 years old), Donna Wolfe (54 years old),

Joseph Studley (53 years old), and Murray Dudgeon (50 years old), as well as others over the age of 40, including Allan Medforth (48 years old), Michael Neiss (44 years old), and Mary Gerzema (42 years old).  (Kesselman Decl. Ex. U; Pl. Dep. 224:23-224:6, 229:9-233:25; Costantino Decl. ¶ 2.)

97.     Plaintiff is not aware of any other meetings that he claims to have been excluded from other than the November 18, 2005 meeting alleged in paragraph 30 of his Complaint.  (Pl. Dep. 259:22-260:14, 262:19-263:5.)

**The Evidence Shows that Mr. Brien Hired, Promoted and Retained Numerous "Older" Individuals**

98.     Soon after Mr. Brien joined in October 2005, he promoted Mr. Hugh Dow to serve as his EVP, Director Global Operations/President M2 Universal Canada.   (Brien Decl. ¶¶ 9-10.)

99.     Mr. Dow was 63 years old at the time of his promotion.  (Costantino Decl. ¶ 2; Pl. Dep. 250:8-17.)

100.    Soon after Mr. Brien joined UM, UM also hired Dianne Cullen to serve as Chief Operating Officer for the Americas.  (Gerzema Dep. 283:25-284:15.)

101.    Ms. Cullen was 54 years old at the time of her hiring.  (Costantino Decl. ¶ 2.)

102.    Mr. Brien also hired Kathy Chalmers on January 1, 2006, as the Global Human Resources Director and Chief Talent Officer, reporting to Mr. Brien.  (Gerzema Dep. 287:9-25; Costantino Decl. ¶ 4.)

103.    Ms. Chalmers was 50 years old at the time of her hiring.  (Costantino Decl. ¶ 2.)

104.    Mr. Brien also took steps to retain another UM employee, Annette Cerbone, who was 52 years old, by approving Ms. Cerbone's request to reduce her schedule to three days per week, even though UM did not typically allow such senior level people work part-time, because

Ms. Cerbone was viewed as a playing an important role at UM at the time.  (Gerzema Dep. 275:11-25; Costantino Decl. ¶ 2.)

105.    As noted above, Murray Dudgeon was 50 years old, and he continued to serve as Global Chief Operating Officer until his retirement in January 2007 because of personal family issues, though he continues with UM as a consultant.  (Brien Dep. 251:9-252:10; 311:5-7.)

106.    Plaintiff admits that Peggy Kelly (56), who headed up the relationship with UM client Johnson & Johnson, and Donna Wolfe (54), who headed Broadcasting, continued to serve in their leadership roles even after Mr. Brien became Chief Executive Officer.  (Kesselman Decl. Ex. 34; Pl. Dep. 224:23-225:6, 233:13-25; Brien Dep. 289:14-16; Costantino Decl. ¶ 2.)

107.    Plaintiff does not allege that any other older employees were excluded from meeting with clients.  (Pl. Dep. 259:22-260:14.)

**Plaintiff Has No Basis for His Belief That His Selection of Several Older Employees Were Terminated Because of Their Age**

108.    Plaintiff identified six people who he believes were terminated on account of their age: Bonnie Chan, Jean Pool, Allan Medforth, Brian Hanley, Diane Plage, and Joseph Studley. (Pl. Dep. 251:10-13, 258:22-259:5.).

109.    Plaintiff was "concerned" that age discrimination may been at play because Ms. Bonnie Chan, who was over 50 years old, had left UM's employment shortly before his termination.  (Pl. Dep. 227:13-17.)

110.    Plaintiff admits that he did not know the circumstances of Ms. Chan's departure or whether Ms. Chan's departure from UM was voluntary or involuntary.  (Pl. Dep 227:13-17.)

111.    In fact, Ms. Chan left UM voluntarily, and resigned because she received an offer for a position as VP Worldwide Media at Mattel/Fisher Price.   (Brien Dep. 322:20-323:18; Costantino Decl., Ex. DD.)

112.    Plaintiff similarly admits that he does not know the circumstances of Jean Pool's departure, except that he knows that she retired, and he does not know whether or not she actually wanted to leave.  (Pl. Dep. 228:5-17.)

113.    Jean Pool was hired in November 2002 to take over the LCI business from Plaintiff, because the client did not believe that Plaintiff was devoting enough time to their account.  (Pl. Dep. 96:3-98:9; Costantino Decl., Ex. EE, at UM 002499.)

114.    At the time of her hiring by UM, Ms. Pool was 57 years old.   (Costantino Decl. ¶ 3.)

115.    With the loss of General Motors as LCI's largest account, there was a restructuring of the LCI business, as a result of which UM laid off numerous employees in the LCI business.  (Brien Decl. ¶ 11; Costantino Decl. ¶ 6; Gerzema Dep. 281:4-13.)

116.    Ms. Pool, with the approval of Mr. Brien, was offered the position of Chief Operating Officer of Magna, an Interpublic Group company in which UM and a sister company pooled their broadcast spending dollars.  (Gerzema Dep. 273:8-23, 271:13-272:6, 282:20-282:6, 37:23-38:4; Kesselman Decl. Ex. W.)

117.    Ms. Pool, however, opted to retire.  (Brien Dep. 324:7; 342:6-12; 344:17-345:11; Gerzema Dep. 37:23-38:4.)

118.    Plaintiff also admitted that he does not know any of the circumstances of Mr. Medforth's termination.  (Pl. Dep. 248:8-249:14.)

119.    Mr. Medforth headed UM's Asia-Pacific region, and had been permitted to run the Asia-Pacific business from Sydney, Australia by prior UM management.  When Mr. Brien became the CEO of UM, he wanted the Asia-Pacific business to be run out of Asia.  Mr. Brien

offered Mr. Medforth to remain as President of UM for Asia-Pacific if he was willing to relocate to Asia. Mr. Medforth declined, and his employment ended as a result. (Brien Decl. ¶ 12.)

120. Plaintiff admits that he does not know the reasons for Mr. Hanley's termination. (Pl. Dep. 245:6-24, 246:12-22.)

121. Plaintiff's belief that Mr. Hanley was terminated because of his age is an "assumption" and his observation of the age of Mr. Hanley, such that "it very well could have been because of their age as well." (Pl. Dep. 245:7-246:8.)

122. Plaintiff admits that he does not have any evidence that Mr. Hanley was terminated on account of his age, beyond his "belief" that Mr. Hanley was terminated because of his age. (Pl. Dep. 246:19-22.)

123. In fact, Mr. Hanley was terminated by for poor performance reasons by Ms. Gerzema, who felt that he had underperformed on the Verizon Wireless account, and did not want to move him to another piece of business and risk that business. (Gerzema Dep. 277:7-17.)

124. Mr. Brien was not involved in Mr. Hanley's termination, nor did Mr. Dudgeon speak with Mr. Brien about Mr. Hanley's termination. (Brien Dep. 208:2-209:17.)

125. The Army account, a pitch which Mr. Hanley had worked on, had not been won by UM at the time of his termination. (Gerzema Dep. 277:18-278:12; Pl. Dep. 260:11-14.)

126. Plaintiff similarly does not have any knowledge of the reasons for Diane Plage's termination from UM. (Pl. Dep. 246:23-248:7.)

127. When Plaintiff spoke with Ms. Plage after her termination, she did not say that it was because of her age. (Pl. Dep. 247:14-248:7.)

128. Diane Plage was an Operations Director for LCI when her employment ended in December 2005. (Pl. Dep. 247:2-6.)

129.    In fact, the reason Ms. Plage's employment ended was because, like many other LCI employees, UM lost the General Motors account, LCI's largest client, in May 2005 resulting in a restructuring of LCI.  (Costantino Decl. ¶ 6; Pl. Dep. 41:20-23; 62:17-20; Gerzema Dep. 281:4-13.)

130.    [INTENTIONALLY LEFT BLANK]

**UM Was Not In A Position to Create A New Position for Plaintiff**

131.    Plaintiff believes that rather than be terminated, he could have been selected to fill any of the following positions:  President of North America, President of Latin America, General Manager of the Los Angeles office (a position that had been vacant after Bonnie Chan's departure), or the Director of New Business or Business Development  (a position that had not yet been created).  Plaintiff also believes UM could have "created" a position for him.  (Pl. Dep. 269:15-24, 292:9-293:3.)

132.    Although Plaintiff had been named as Acting Regional Director for Latin America by Murray Dudgeon, he was aware that his role as Acting Regional Director for Latin America was a temporary assignment until such time as UM hired a permanent regional director. (Pl. Dep. 47:6-12, 47:22-50:15.)

133.    Plaintiff saw his role as Acting Regional Director for Latin America as being to "mentor" Mr. Carlos Gutierrez, who was handling the day to day media responsibilities in the region.  Mr. Dudgeon asked Plaintiff merely to "check in with him, see what he needs" but that it would not take a lot of time.  (Brien Dep. 161:21-23; Pl. Dep. 47:22-50:24.)

134.    Mr. Brien selected Carlos Gutierrez to be Regional Director for Latin America (or as it became known, President, Latin America).  (Pl. Dep. 51:15-19.)

135.   Mr. Brien selected Mr. Gutierrez for this position because Mr. Gutierrez was already running that region, and Mr. Brien believed that he had more significant insight and understanding of the media business in the Latin American region and did not require oversight from an additional level of management from Plaintiff, particularly in UM's environment of massive losses and effort to reduce expenses.   (Brien Dep. 276:24-277:14, 161:21-23;  Brien Decl. ¶¶ 3-6.)

136.   At the time of his promotion, Mr. Gutierrez was actively responsible for the following accounts in Latin America: Coca-Cola, Johnson & Johnson, General Motors and Mastercard.  In addition, Mr. Gutierrez is the person to whom accounts such as L'Oreal would turn when they had specific need in the Latin American region.   (Brien Decl. ¶ 4.)

137.   Mr. Gutierrez speaks Spanish, which Plaintiff admits is a benefit for the position of Regional Director of the Latin America region .  (Pl. Dep. 50:16-22.)

138.   Plaintiff does not speak Spanish.  (Pl. Dep. 50:23-24.)

139.   Plaintiff admits that he and Mr. Dudgeon both believed that Mr. Gutierrez "had a lot of potential and could in the future become a very valuable employee for us."  (Pl. Dep. 50:8-15.)

140.   Plaintiff admits that with respect to he Latin America he only had "a little bit of experience, not a lot," and that Latin America is a "very complex situation."  (Pl. Dep. 49:5-50:24.)

141.   Plaintiff was not even sure that he even wanted the Regional Director of Latin America job, because it would have required a lot of travel and was a very "unusual"  and "complex" situation that "required quite a bit of knowledge", and therefore he "didn't feel that I should necessarily put my name forward for it."  (Pl. Dep. 49:5-50:24.)

142.   Mr. Gutierrez's base salary in December 2005 was approximately $120,000. (Brien Decl. ¶ 8.)

143.   In comparison, Plaintiff's salary compensation at the time of his termination was $295,000 plus a $5,000 car allowance.  (Pl. Dep. 270:22-24.)

144.   The President, Latin America position is currently based out of Mexico City. (Brien Decl. ¶¶ 3, 7; <u>see</u> <u>also</u> Pl. Dep. 51:20-21.)

145.   Plaintiff never applied for, or requested to be appointed to, the permanent position of Regional Director for Latin America.  (Pl. Dep. 49:5-7.)

146.   Plaintiff alleges that Scott Tegethoff, a younger individual (age 40 in 2005), was permitted to remain employed at UM even though he was responsible for the global L'Oreal business after the global business ceased.  (Pl. Dep. 271:11-20; Costantino Decl. ¶ 2.)

147.   Plaintiff does not know what role Mr. Tegethoff played after the loss of the global L'Oreal business.  (Pl. Dep. 271:21-272:2.)

148.   In fact, Mr. Tegethoff had been running the L'Oreal business globally and for the United States, and the issue was that L'Oreal USA wanted Mr. Tegethoff to spend all of his time on them, while Mr. Tegethoff preferred to remain in a global position.  (Brien Dep. 184:15-186:10.)

149.   Mr. Tegethoff remained as head of the global L'Oreal business during 2006, after his responsibility on the United States business was removed. (Gerzema Dep. 268:11-13.)

150.   Mr. Brien did not try to assist Mr. Tegethoff to find another role.   (Brien Dep. 274:16-275:12.)

**Plaintiff Points to Only a Single Age-Neutral Comment Unrelated To
The Termination of His Employment, And Admits That There Were
<u>No Other Discriminatory or Ageist Comments.</u>**

151.    On October 7, 2005, Mr. Brien held a meeting for everyone in the New York office to introduce himself to that office.  This meeting lasted approximately 30 minutes.  (Pl. Dep. 33:20, 213:6-214:2, Brien Dep. 398:11-12.)

152.    According to Plaintiff, during this meeting, Mr. Brien introduced himself and talked about himself, his career, and why he was qualified for this new position as CEO. Plaintiff alleges that he then directed his comments to the younger people in the room, saying "I'm speaking to you.  You are the people who have grown up with the new media, you live the new media, you know this new media, you get it" and shortly thereafter said that "things were going to be different around here, that it was going to be based -- that it was not going to matter how long you have been here, it was going to matter about ideas."  (Pl. Dep. 213:6-214:2.)

153.    Plaintiff interpreted Mr. Brien's alleged comment that "young people get it, you live this new media, you work with it every day" to "virtually" mean that Mr. Brien wanted to "transform the agency and make it appear younger, because younger meant that it was digital media."  (Pl. Dep. 216:4-12.)

154.    Nor did Plaintiff like Mr. Brien's comment that "it didn't matter how long you had been here," though he did agree with the comment that ideas were something that was needed. (Pl. Dep. 214:13-17.)

155.    Plaintiff admits that other than the single alleged comment in this October 7, 2005 meeting, Mr. Brien never made any negative comments about him or anyone else with respect to age.  (Pl. Dep. 219:11-220:16.)

156.    Plaintiff concedes that Mr. Brien never made any other ageist or derogatory comments towards him or about anyone else's age.  (Pl. Dep. 219:25-220:11; 293:4-9.)

157.    Plaintiff never heard anyone at McCann-Erickson say anything negative about his age.  (Pl. Dep. 293:10-14.)

158.    Nor did Plaintiff ever hear any negative comments at UM about older people.  (Pl. Dep. 294:4-6.)

159.    Plaintiff never heard Mr. Brien comment that he was trying to make the company younger.  (Pl. Dep. 258:9-13.)

160.    Mr. Brien, for his part, states that what he discussed at this October 7, 2005 meeting with respect to young people was in the context of the importance of understanding consumer consumption and application levels, in particular the consumption and application levels of <u>younger consumers</u> who tend to use digital technology more, that "Young people, as in consumers, young consumers, are growing up with technology.  Therefore, we need to understand how they are using it and how they are applying technology in their lives if we are to devise strategic marketing and media strategies to engage in."   (Brien Dep. 395:3-400:25, 403:15-23, 404:24-405:6.)

161.    Indeed, Mr. Brien noted that understanding technology and its use in marketing has nothing to do with age, and in fact, the individual Mr. Brien believes to be the leading technologist in the industry today, Bob Greenberg, is himself 60 years old.  (Brien Dep. 397:17-22.)

162.    Nor is it a surprise that an advertising industry professional must be sensitive to how technology is used by various consumer segments, including younger consumers.  Indeed, Plaintiff's current employer, Mohen Inc. and SpiralFrog, a free music service supported by advertising, states that "SpiralFrog plans to reach the younger segment of the music download community, which is the reason for its name, a made-up term Mohen said was conceived to

25

'appeal to a 19-year-old, but would turn off a 50-year-old'" and noting "the need for marketers to find alternative ways of reaching young consumers", and selling SpiralFrog on the basis that it "provides advertisers with a way of tapping difficult to reach, savvy young Internet users.") (Kesselman Decl., Ex. X at pp. 1, 2 (emphasis added).)

163.   Plaintiff himself had a similar reference to younger consumers, stating that "SpiralFrog is an attractive opportunity for marketers because we reach the highly-desirable college demographic when they are engaged in pursuing their passion for music."  (Kesselman Decl. Ex. Y at p. 2.)

164.   Notably, it was Plaintiff himself that suggested at one point during his employment in May 2005 suggested that an account should be staffed with "bright young people." (Kesselman Decl. Ex. Z at UM 02455 (emphasis added).)

165.   Plaintiff asserts that his reference to "bright young people" is not discriminatory against older people because "I didn't say anything about old people not being able to do that job. I said I wanted bright young people because they were the kind of people, bright people who would fill an entry level position and that's what we needed."  (Pl. Dep. 179:20-180:3.)

**Plaintiff's Past Awards Were All Long Before the Client Losses That He and UM Suffered**

166.   Plaintiff received the HK McCann Award in 1988.  He did not receive that award again since that time.  (Pl. Dep. 236:18-23.)

167.   In 1998 or 1999, the department which Plaintiff supervised was presented with the McCann Creativity and Media Award.  It was not an individual award.  (Pl. Dep. 237:4-17.)

168.   Plaintiff was named a "Media Maven" by Advertising Age in 2000.  He was not named a Media Maven since that time.  (Pl. Dep. 237:18-25.)

169.   He also received a "Truth Well Told" award in 1980 that was more minor in nature.  (Pl. Dep. 238:4-12.)

170.    At the time of his termination, Plaintiff held the title of Executive Vice President,

Client Services, a position to which he had been promoted in 2001.  (Pl. Dep. 236:9-11.)

171.    Plaintiff did not receive any awards since 2000.  (Pl. Dep. 236:18-239:6.)


Dated: New York, New York
      November 8, 2007

SEYFARTH SHAW LLP

By _____s/ Dov Kesselman_____
      Dov Kesselman (DK-6571)
      Michael Tiliakos (MT-1678)
620 Eighth Avenue
New York, New York 10018
(212) 218-5500

Attorneys for Defendants The Interpublic
Group of Companies, Inc., and McCann-
Erickson USA, Inc.